(160 App. Div. 171)

### THORNTON BROS. CO. v. THOMAS H. TULLY CONST. CO.

(Supreme Court, Appellate Division, First Department. January 9, 1914.)

EXCHANGE OF PROPERTY (§ 5*)—MARKETABLE TITLE—OBJECTIONS TO TITLE—RIGHT TO MAKE—ESTOPPEL.

    Where the title to certain real property which defendant had agreed to convey to plaintiff in an exchange was defective, in that there was an outstanding title to a certain gore, and also because of restrictive covenants, and the time to close was extended from time to time to enable defendant to obtain quitclaim deeds from certain heirs who owned the gore, and at no time had there been a definite rejection of title by plaintiff, based solely on the defect in the title to the gore, it was not estopped after such extensions to urge the restrictive covenants also as a defect and to refuse to grant defendant further time to perfect the title.

    [Ed. Note.—For other cases, see Exchange of Property, Cent. Dig. §§ 5, 6, 8–10; Dec. Dig. § 5.*]

    Dowling, J., dissenting.

Appeal from Special Term, New York County.

Action by the Thornton Brothers Company against the Thomas H. Tully Construction Company. From a judgment in favor of defendant, plaintiff appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

---

Thomas A. McKennell, of New York City, for appellant.
William Kaufman, of New York City, for respondent.

INGRAHAM, P. J.   By an agreement made on July 15, 1911, the plaintiff corporation agreed to convey to the defendant corporation a plot of ground with the improvements thereon, known as 835 Home street, in the borough of the Bronx, at a valuation for the purpose of this contract of $40,000, subject to first mortgage for $29,000, and the defendant corporation agreed to convey to the plaintiff corporation a plot of ground with the improvements thereon, known as 1074 Boston avenue, in the borough of the Bronx, at a valuation for the purpose of this contract of $10,000, subject to a first mortgage for $2,000, and a second mortgage for $2,000, and the difference between the values of the respective premises, over and above incumbrances, for the purpose of this contract, was to be deemed to be $5,000, and that sum was to be paid, $500 on the signing of the agreement and $4,500 on delivery of the deeds, at 2 o'clock, July 31, 1911.   Each of the parties agreed to convey the premises free from all incumbrances except as therein stated.   When the parties attended at the closing of the contract on July 28, 1911, the plaintiff objected to the title of the defendant to the property that it was to convey and refused to complete, whereupon the time for the completion of the change of title was adjourned from time to time to November 1, 1911.   On that date, the plaintiff, still claiming that the title was unmarketable, refused to complete and brought this action for specific performance of the contract; but, if defendant could not convey good title to the premises, the plaintiff asked to recover the sum of $500 paid on the execution of the contract and other damages specified in the complaint, and that a lien be imposed upon the property of defendant to satisfy the amount to which plaintiff was entitled.

Upon the trial the court found the making of the contract, that when the parties attended on July 28, 1911, the only objection interposed to the title by the plaintiff was that there were certain rights outstanding in the heirs of the original grantor to a certain gore on the premises to be conveyed.   The court found that on July 28, 1911, the defendant's premises were and still are incumbered by certain restrictive covenants contained in a conveyance bearing date the 15th day of April, 1904, and recorded in the office of the register of the county of New York.   These covenants restricted the use of the premises so that there could not be erected upon the said premises for 20 years any building or buildings except such as may be at least three stories in height, wholly above the ground, and to be occupied as private residences or flats, except that the first or ground floor may be used for stores for business purposes, and further prohibiting the erection on the premises of any brewery, distillery, slaughterhouse, stable, smith shop, forge, furnace, steam engine, brass foundry, or other metal foundry, soap, candle, starch, varnish, vitriol, glue, or ink factory or any factory for tanning, dressing, or preparing skins or hides or any other dangerous, noxious, or offensive business or establishment whatsoever.   This restrictive covenant was an incum-

brance upon the property and unless waived by the plaintiff justified the refusal to accept title. They restricted for 20 years the use of the premises to buildings of at least three stories in height, to be used as private residences or flats, except the first or ground floor for stores and business purposes, and contained permanent covenant against the use of the premises for the various purposes mentioned. This restrictive covenant was not specified in the contract, which specifically provided that the land should be free from all incumbrances except those stated therein.

The court further found that when the parties attended on July 28, 1911, at the closing of the contract, the only objection interposed to the defendant's title by the plaintiff was that there were certain rights outstanding in the heirs of the original grantor to a certain gore on the premises to be conveyed, and that, to satisfy the demand of the plaintiff, the defendant, at great expense of time, labor, and money, after the plaintiff had taken up the question of obtaining quitclaim deeds from the heirs of the original grantor, did and has finally obtained the quitclaim deeds to the gore in question, and that at no time between July 28, 1911, and November 1, 1911, did the plaintiff inform the defendant that it would object to the defendant's title on the ground that there were certain covenants restricting the use of defendant's premises, that the plaintiff agreed that, upon notification to it by the defendant that the latter had obtained all the quitclaim deeds, it would close the contract two days thereafter, that on November 1, 1911, the plaintiff duly tendered its deed and the unpaid part of the purchase price and refused to take the deed to defendant's premises on the ground of the outstanding rights of the heirs of the original grantor, and on the further ground that there were certain covenants restricting the use of the defendant's premises, that this was the first occasion upon which the plaintiff interposed the objection to defendant's title that there were covenants restricting its use, that within a short time after the 1st day of November, 1911, the defendant did obtain the quitclaim deeds from all the heirs of the original grantor, that the plaintiff has refused to comply with the terms of the contract of exchange entered into by the plaintiff and defendant, and that on November 9, 1911, the plaintiff commenced this action. Thereupon the court dismissed the complaint, and from that judgment the plaintiff has appealed.

On the trial the plaintiff, having proved the tender and refusal to accept the title of the defendant to the premises and these incumbrances, rested. Whereupon the defendant's attorney testified that on July 28, 1911, and on Monday, August 7, 1911, a date to which the completion of the contract had been adjourned, the Lawyers' Title Insurance & Trust Company, after making a partial examination of the title to the premises, reported that they had discovered this defect as to the title to the gore, and raised objection as to the amount of the first mortgage, which appeared from the record to have been $4,000 instead of $2,000, as stated in the contract; that the representative of the title company said there were these outstanding rights affecting this gore and the plaintiff agreed to take title if

the defendant could get a policy from any company, and the defendant's counsel then stated that he would endeavor to satisfy the Title Guarantee & Trust Company, to which plaintiff said it would be satisfied with that.    Thereupon they adjourned the closing of the title for a week, and, on the adjourned date, the defendant stated that they had been unable to get anything definite from the title company, and the matter was then further adjourned.    Thereafter there seems to have been continued negotiations with the title company. The defendant further proved that some time in September, 1911, they took up the question of procuring quitclaim deeds; but it does not appear just what progress had been made on the final date, November 1, 1911, to which the closing was adjourned.    It does, however, appear that at that time defendant had not perfected its title. On that date the plaintiff attended and asked if the defendant was ready to close the title, and, when the defendant said they still had two or three quitclaim deeds to obtain, that certain heirs had refused to sign until all the others had signed, that negotiations were under way to get those other quitclaim deeds, and that he would have them within a few days.    The plaintiff said they would not wait any longer and made a tender and rejected the deed of the defendant upon the ground that there was this outstanding gore and these restrictive covenants.    That was the first occasion, it is said, upon which the plaintiff relied upon objections to the restrictive covenants.

It is quite evident that the plaintiff had left this question to the title companies, and really had no knowledge as to the real objections to the title, and that there never was at any time down to November 1, 1911, any specific agreement to accept this title if the quitclaim deeds from all the heirs were obtained.    The parties had kept the contract alive from time to time, so that the final closing was to be on November 1, 1911.    The plaintiff had adjourned the time of closing from July 28, 1911, to November 1, 1911, to give the defendant time to procure these quitclaim deeds.    Upon that date the quitclaim deeds had not been obtained from all the heirs and the title was not then marketable.    The defendant was not therefore in a position to comply with the obligations of the contract to convey a good title, free from all incumbrances except those stated therein.    The plaintiff could then stand upon its legal rights, could insist that the defendant should convey a title as provided in the contract.    If at that time the defendant had procured the quitclaim deeds from all the heirs and at that time had tendered a title free from all objections raised by plaintiff as to the gore, a different question would have been presented.

The defendant could not then comply with his contract, and plaintiff was entirely within its rights in refusing further adjournments and in making demand that defendant either convey good title to the premise or return the money paid on execution of the contract.    The plaintiff refused a further extension of time for defendant to comply with the contract and demanded the return of the money paid and of the expenses incurred in the examination of the title, and on November 9, 1911, commenced this action.

It is clear that these quitclaim deeds were not obtained prior to the

time when the action was commenced. The defendant in its answer set up a counterclaim, demanding specific performance; but it seems to have made no demand on the trial for such relief. The right of the plaintiff, who asks only to recover the money paid when the contract was executed, and the expenses incurred in examining the title, must depend, it seems to me, upon the question as to whether or not, at the time the contract was to be completed, the defendant was in default in the completion of its contract. At that time it clearly was in default. It had not a marketable title to convey. Certainly, the plaintiff, having extended the time from July 28, 1911, to November 1, 1911, to enable the defendant to obtain marketable title, was not bound to continue indefinitely the time in which the defendant could obtain these quitclaim deeds, and the plaintiff was then entitled to a return of his deposit and the amount of expenses incurred in examining the title. The fact that subsequently, and after the commencement of the action, the defendant obtained the quitclaim deeds which would have obviated this objection to the title, could not, I think, defeat the plaintiff's cause of action. I am also of the opinion that, upon the facts as disclosed upon the trial, the plaintiff was not estopped from asserting on November 1, 1911, that the restrictive covenants were incumbrances. There was at no time a definite rejection of the title based solely upon the defects in the title to the gore in the premises. The representative of the title company had stated that that was an objection to the defendant's title, and there had been negotiations between the title companies and the defendant, in relation to insuring the title, and, while the plaintiff was willing at any time on two days' notice to accept the title, if the plaintiff could secure title policy thereon, this agreement to take title was based on a policy of title insurance and not on a specific objection. The title company refused to insure the title, and it was not marketable on the date to which the closing was finally adjourned. At that time, I think, the plaintiff had the right to raise any objections from which it followed that the title was unmarketable.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event.

CLARKE, SCOTT, and HOTCHKISS, JJ., concur.

DOWLING, J. I dissent upon the ground that the plaintiff, by its actions and declarations, had estopped itself from urging any objection to the title tendered by defendants, save that of the existence of certain outstanding interests in the gore lot. In reliance upon the position so taken by the plaintiff, the defendant proceeded to obtain the requisite deeds to clear the title to said lot, and by the time of the trial, as plaintiff well knew, was in position to meet the sole objection thus far advanced. The testimony, in my opinion, discloses sufficient knowledge of the condition of the title on the part of plaintiff before the time set for closing, so that its insistence upon one objection only was with full knowledge of the facts.

For these reasons, I believe the judgment appealed from was correct and should be affirmed.